Brown, to use, *v.* Aiken (Forte, Appellant).

Argued December 10, 1937. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John F. E. Hippel,* with him *George B. Clothier,* and *Leon J. Obermayer,* of *Edmonds, Obermayer & Rebmann,* for appellant.

*Morris Wolf,* of *Wolf, Block, Schorr & Solis-Cohen,* for appellee.

OPINION BY MR. JUSTICE MAXEY, April 11, 1938:

This appeal arises from a decree of the Court of Common Pleas No. 2 of Philadelphia County, awarding judgment to the appellee on a petition and answer in

proceedings for the recovery of possession of real estate under the Act of April 20, 1905, P. L. 239 (12 P. S. 2571 et seq.). The petition for citation was for the recovery of possession of premises at 4716-18-20 Baltimore Avenue, Philadelphia, a motion picture theatre property, and was instituted against Earl M. Forte, the person in possession of the premises, as respondent, on behalf of Northern Trust Company (successor trustee), purchaser of the premises at a sheriff's sale on March 1, 1937. Mr. Forte answered the petition by claiming that he was entitled to remain in possession by virtue of a lease for five years from February 1, 1937. The matter having been disposed of by the court below upon the petition and answer, we must go to these pleadings to obtain the facts, and we find them to be as follows:

In 1927, Albert Aiken owned the premises in question. As owner he gave a first mortgage on the premises for $190,000 to Jacob E. Brown. The bond and mortgage, by duly executed assignment, went to the Philadelphia Company for Guaranteeing Mortgages. The Philadelphia Company then executed a declaration of trust of the mortgage and sold the usual participation certificates. Receivers were appointed by the Federal Court for the Philadelphia Company in 1933. In December of 1936, the Northern Trust Company was appointed trustee under the first mortgage in substitution for the Philadelphia Company in receivership. In 1930, however, title to the premises passed to the Upright Building and Loan Association after foreclosure proceedings on the second mortgage. Thereafter in 1934, the building was conveyed by the Association to Herman Cohen, who reconveyed it to the Association in 1936. In the meantime in 1935 the Banking Department took over the Association's assets, including these premises, and it remained in such possession until the foreclosure of the mortgage to which we will shortly make reference.

While the Building and Loan Association was the owner of the premises, it leased the property to Earl M.

Forte, for a term of five years beginning February 1, 1932. The lease was executed on January 30, 1932. Its provisions requiring our consideration are set forth in the footnote below.[1]

---

[1] "From February 1, 1932, to January 31, 1933, a sum equivalent to twenty per cent of the gross box office receipts of the business conducted by the Lessee on the aforesaid premises, to be paid on or before the 20th day of each month beginning with the 20th day of March, 1932;

" From February 1, 1933, to January 31, 1934, a sum equivalent to twenty per cent of the gross box office receipts of the business conducted by the Lessee on the premises, Lessee, however, guaranteeing the minimum annual rental of $15,000, payable in monthly installments of $1,250. The guaranteed monthly rental of $1,250 shall be paid on the first day of each month in advance beginning February 1, 1933, and any additional sums payable as representing the surplus of 20% of the gross box office receipts, if any, over and above the said minimum rental, shall be calculated within twenty days after the expiration of the current year and the amount, if any, thus determined as due the Lessor, shall be then paid to it by the Lessee;

"From February 1, 1934, to January 31, 1937, a sum equivalent to twenty per cent of the gross box office receipts of the business conducted by the Lessee on the premises, Lessee, however, guaranteeing the minimum annual rental of $18,000 payable in monthly installments of $1,500. The guaranteed monthly rental of $1,500 shall be paid on the first day of each month in advance beginning February 1, 1934, and any additional sums payable as representing the surplus of 20% of the gross box office receipts, if any, over and above the said minimum rental, shall be calculated within twenty days after the expiration of the current year and the amount, if any, thus determined as due the Lessor, shall be then paid to it by the Lessee."

"Lessee is hereby given an option for the renewal of this lease subject to all of the terms and provisions thereof for an additional term of five years from February 1, 1937, being the date of the expiration of the term, which option shall be exercised by Lessee giving to Lessor at least one hundred twenty (120) days' notice prior to the termination of the five-year term of his intention to exercise this option. The annual rental for the renewed term of five years shall be a sum equivalent to twenty per cent of the gross box office receipts of the business conducted by the Lessee on the premises, Lessee, however, guaranteeing a minimum annual rental of at least $24,000, payable in monthly installments of $2,000."

About February 1, 1933, the Association agreed in writing that the lease should be modified in that the rental for the ensuing year should be 20 per cent of gross box office receipts, or $12,000 per annum, whichever was greater, and the answer charged that the same minimum guarantee was continued in effect by oral agreements during subsequent years, the lessor waiving the provision for an increase thereof, and that this arrangement had the verbal affirmation of the Deputy Receiver of Banking in charge of the Association.

Early in 1935, because of defaults under the mortgage, the Philadelphia Company, through the Mortgage Service Company, agent for the trustee under the mortgage indenture, took possession for a brief period during November, 1935, for the purpose of collecting rents. It received the rental at less than the minimum which would otherwise have been in effect. On October 24, 1936, the mortgagee again resumed formal possession of the premises and collected the rents until foreclosure of the first mortgage.

On June 15, 1936, being 120 days preceding the date fixed for the termination of the lease, the respondent, in his answers, says he called upon the Deputy Receiver, who was then acting as rental agent for the agent for the trustee under the mortgage indenture, the Mortgage Service Company, and also as receiver for the Building and Loan Association, and gave him notice that he elected to exercise his option to renew and extend the lease for a further term of five years, subject to the continuance of the provision guaranteeing a minimum rental of $12,000 per annum. He avers that the Deputy Receiver "accepted and agreed to" the notice of renewal and modification. He also charges that he gave a similar notice, a month later, to William H. Groetzinger, Jr., a "duly authorized officer and agent of said Mortgage Service Company, . . . that he, the respondent, had elected to renew said lease, modified as to rental as aforesaid," and that in "the early part of November,

1936, he called on William L. Stough Noll, duly authorized officer and agent of said Mortgage Service Company, which in turn was the duly authorized agent for the trustee under the aforesaid mortgage. . . ." and that "at said interview the . . . officer and agent of said Mortgage Service Company expressly acknowledged and affirmed on its behalf, and on behalf of the mortgagee in possession . . . the aforesaid renewal of said lease for five years at $12,000 per annum, or 20 per cent of gross box office receipts, whichever might be greater, and agreed that respondent's occupancy was to continue on that basis for the ensuing five years, whether or not a new lease was entered into. . . . No new lease was ever entered into between the parties." All of the above notices to exercise the option to renew and extend the lease for a further term of five years, and the modification of the rental and all of the acceptances, acknowledgments, affirmations, and agreements relating thereto were verbal and not in writing.

This was the state of the record when the Northern Trust Company, the appellee herein, very soon after its appointment, instituted foreclosure proceedings on the first mortgage from Aiken to Brown, which resulted in a sheriff's sale on March 1, 1937, at which it bought the mortgaged premises as trustee. On March 8, 1937, the sheriff delivered his duly executed deed for the premises to the trustee. Two days later the trustee formally demanded possession from Mr. Forte and he refused to vacate the premises. As a result the proceedings under the Act of 1905 (supra) were instituted which resulted in the judgment of ouster and possession, from which this appeal is taken.

The first fact that stands out in this case is that the mortgage was recorded in 1927, long prior to the execution of the lease in question, which was entered into on January 30, 1932. A purchaser at a sheriff's sale through legal proceedings under such a mortgage has the paramount right of possession over the tenant, sub-

ject to no limitations. This tenant can assert no right of possession by virtue of this lease paramount to that of the purchaser at this judicial sale. Section 14 of the Act of April 20, 1905, P. L. 239 (12 P. S. sec. 2585) provides as follows: "The right of possession of a tenant for years shall be deemed paramount to that of a purchaser at a judicial sale if, and only if, the letting to him shall precede in point of date the entry of the judgment, order or decree on which such sale was had, and also shall precede the recording or registering of the mortgage, deed or will, if any, through which by legal proceedings the purchaser derives title, unless the letting is made with actual notice to such tenant of the contemplated entry of such judgment, order or decree, or of the fact of the execution of such mortgage, deed or other instrument of writing, and with intent to avoid the effect thereof."

Any purchaser may renounce his paramount right and the appellant here relies on the express *oral* agreement of the mortgagee to accept him as a tenant, as such renunciation. He concedes "that without an affirmance of the lease it could not bind the purchaser at the sheriff's sale, for the mortgage antedates the lease by almost five years, and so takes precedence over it as provided by Section 14. . . ." The first question that presents itself is: When was it affirmed? Certainly no fact is set forth in the pleadings showing an affirmation of this lease subsequent to the judicial sale. The sheriff's sale took place on March 1, 1937; the Sheriff's Deed Poll was delivered on March 8, 1937, and on March 10, 1937, the tenant was notified in writing that he was "to vacate the premises and deliver possession thereof to the said Northern Trust Company, successor Trustee, prior to March 17, 1937." And so likewise the pleadings are devoid of facts showing a waiver by the mortgagee or purchaser of its right to disaffirm the renewed lease. Not one affirmative act is charged, in the pleadings, to the mortgagee, such as the acceptance of rent after the

judicial sale, tending to show a renunciation by the purchaser of his statutory right, or which may tend to show a waiver of the purchaser's right to disaffirm the lease. See *Curry v. Bacharach Quality Shops, Inc.,* 271 Pa. 364, 117 A. 435. The tenant's answer is also silent on the question as to whether or not any notice was given at the sheriff's sale of the alleged agreement. No purchaser at such a sheriff's sale would be bound by any such agreement. It is conceded that there is no recorded agreement prior to the judicial sale. This being the state of the record we must hold that this lease was discharged by this sale and the tenant's right to possession was lost. See *Loomis' Appeal,* 22 Pa. 312, and *Harp Bldg. & Loan Assn. v. Davis,* 56 Pa. Super. Ct. 282.

We could very well rest our opinion upon Section 14 of the Act of 1905, but other vital questions have been raised in this case by the appellant which are entitled to discussion.

The appellant charges that the affirmation of the lease was prior to the judicial sale. He argues that the appellee, the mortgagee, who "was the purchaser at the sheriff's sale . . . had expressly agreed while in possession of the premises prior to the foreclosure that the lease as renewed should be affirmed . . . ," and then asks: "Why should it matter that the affirmance took place prior to the foreclosure and not afterwards?" What was the nature of this affirmation, as pleaded, on the part of the appellee? It is, that during the term of the lease and prior to the foreclosure proceedings, defaults having occurred, the mortgagee took possession for a brief period from November 13 to November 27, 1935, for the purpose of collecting rents, . . ." and on ". . . October 24, 1936, . . . Mortgage Service Company . . . reëntered into formal possession of the premises . . . called for and reëxamined copy of the . . . lease, and affirmed the same as modified *by accepting rental* . . . from respondent, . . . *all with full notice of re-*

*spondent's election to renew said lease* for five years
. . . at . . . reduced rental. . . ." (Italics supplied.)
The Mortgage Service Company is described in the an-
swer as the "agent for Philadelphia Company for Guar-
anteeing Mortgages, for which petitioner is successor
trustee under said mortgage. . . ." In his brief of argu-
ment the appellant states that "the mortgagee's title,
while essentially a form of security for the loan, never-
theless enables the mortgagee to enter into actual pos-
session at any time, if he can do so peaceably. *Bulger v.
Wilderman and Pleet,* 101 Pa. Super. Ct. 168 (1930).
*But this mortgagee chose rather to collect the rents
from the existing tenancy, and so assumed constructive
possession only"* (italics supplied). We cannot see how
the facts as pleaded amount to anything more than the
acceptance of rents by the mortgagee prior to fore-
closure, and it certainly does not attain the dignity of
an attornment by the tenant to the mortgagee. In *Ran-
dal v. Jersey Mortgage Investment Co.,* 306 Pa. 1, 5,
158 A. 865, Justice SIMPSON, speaking for this court,
said: "Whenever a mortgagor or one claiming title un-
der him leases the mortgaged premises after the execu-
tion of the mortgage, his rights are necessarily subject to
the prior rights of the mortgagee or his assignee, unless
there is an agreement otherwise. Hence, if, under such
circumstances, upon notice to the tenant, the latter pays
the rent to the mortgagee or his assignee, *it is equivalent
of an attornment* [italics supplied], and the mortgagor
and those claiming title under him, cannot justly com-
plain of such payments."

If from the words "equivalent to an attornment," it is
contended [2] that this court meant to say it is *equal to*

---

[2] In *Toub v. Tessler,* 18 D. & C. 220, 222, Judge GORDON, in re-
viewing Justice SIMPSON's phrase, "the equivalent of an attorn-
ment," said: ". . . we think this expression . . . falls far short
of holding that payment of rent to the mortgagee after default
constitutes an *attornment in law* as between him and the tenant,
when the right to collect rent already exists by virtue of the terms

an attornment or that it *is* an attornment, or that it has the incidents of an attornment, we now declare that such is not the law of this state. The payment of rent to the mortgagee in possession is *not* an attornment. For "his possession is never absolute, but only a security or pledge for the debt due him. He must account to the mortgagor for the rents or profits received; and when his debt is paid, the mortgagor is entitled to have back his possession . . .": *Bulger v. Wilderman and Pleet* (supra). And so, also, its acceptance by the mortgagee will not be construed as an affirmance of the lease. The acceptance of the rents and profits under a lease by a mortgagee in possession does not affect or alter the tenant's relationship to the parties. There is neither privity of estate nor privity of contract created by this act between the tenant and the mortgagee in possession. "As between the parties it is a conveyance, so far as is necessary to enforce it as a security. *As regards third persons* [italics supplied], the mortgagor is the owner, even of the legal estate": *Presbyterian Corporation v. Wallace,* 3 Rawle 109. In *Harper v. Consolidated Rubber Co.,* 284 Pa. 444, 451, 131 A. 356, we held: ". . . the title to the mortgaged premises may be accounted in the mortgagee *'as between parties'* to the transaction represented by the mortgage 'so far as it is nec-

---

of the mortgage. One thing which is equivalent to another may not in all respects be identical, and we take it that the very use of this word implies a careful purpose to decide that such a payment in only the equivalent of an attornment rather than that it is an attornment." (Italics supplied.)

"The payment of rent by the tenant to the mortgagee upon the latter's demand has been termed the equivalent of an attornment. . . . It is submitted that the courts in Pennsylvania will probably adopt the view that payment of the rent to the mortgagee is 'the equivalent of. an attornment' *in the sense* [italics supplied] that the lessor-mortgagor cannot assert a duty on the part of the tenant to again pay the rents already paid the mortgagee": "Pennsylvania Mortgagee in Possession," 11 Temple Law Quarterly 491, 499.

essary to render the instrument effective as a security,' but *as to all other persons* [with some special exceptions] the mortgagor is regarded as the owner, and the mortgage as a mere encumbrance and accessory to the debt' which summarizes the predominant effect of our decisions." (Italics supplied.)

The tenant has to pay it by virtue of this lease, and the substitution of the mortgagee, a person in privity with his landlord's title, in place of the landlord as the party to whom payment thereunder is to be made, is not an act that will alter the relations of the parties. The mortgagee may "voluntarily relinquish formal possession," as it is pleaded he did in this case, and permit the lessor to continue to collect these rentals. So that we must declare that there was no affirmation of this lease by the mortgagee "by accepting rental," that is, that no privity of estate or privity of contract was thereby created between the mortgagee and the tenant.

In *Teal v. Walker*, 111 U. S. 242, 248, the Supreme Court of the United States held: "Where, however, the lease is subsequent to the mortgage, the rule is well settled in this country, that, as no reversion vests in the mortgagee, and *no privity of estate or contract is created* [italics supplied] between him and the lessee, he cannot proceed, either by distress or action for the recovery of the rent [citing cases]." See also *Mass. Ins. Co. v. Wilson*, 10 Metc. (Mass.) 126; *Hogsett v. Ellis*, 17 Mich. 351.

If it is conceded that there was a complete attornment and that it is properly pleaded in the answer, how does that give the tenant any greater rights under his lease than he would have had if there was no attornment and these foreclosure proceedings had taken place? The tenant's rights were not enlarged under the lease by an attornment. It merely is an acknowledgment by the attornment that "the freehold is in another, or that such person is his landlord." See 1 Words & Phrases Judicially Defined 637. It gives no greater force or effect

to the lease than it theretofore had nor does it enlarge the estate in the lease. The lease is still subordinate to the mortgage. Any other interpretation would be destructive of the security of mortgages. The tenant's rights under such a lease are not enlarged by any attornment. This being so, the lease is discharged by the sale under the mortgage and the tenant's right to possession will not be deemed paramount to that of a purchaser at the judicial sale under Section 14 of the Act of 1905, supra.

This brings us to the third question: If the lease was affirmed in November, 1936, for the ensuing five years by the Mortgage Service Company, the agent of the mortgagee, then in the hands of a receiver duly appointed by the Federal Court, must this affirmation be in writing by reason of the Statute of Frauds, Act of March 21, 1722, 1 Sm. L. 389, sec. 1 (33 P. S. 1)? This section provides: "All leases . . . of . . . any lands, tenements or hereditaments, made or created by livery of seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect . . . ; except, nevertheless, all leases not exceeding the term of three years from the making thereof."

Without going into the questions raised by the appellee whether a representative of the Mortgage Service Company, an agent of the mortgage trustee then in the hands of receivers, has authority to affirm such a lease because the receiver in the first instance is the representative not of the mortgagee but of all parties having an interest in the reorganization proceedings, and that therefore his rights are not subject to the control of the mortgagee and that the mortgagee is not liable for his defaults, we will proceed with the question whether the oral agreement exercising the option to renew the writ-

ten lease for five years upon the payment of a modified rental than that set forth in the written lease is unenforceable by reason of the Statute of Frauds.

The question is raised by the appellant that the Statute of Frauds was not pleaded and therefore the petitioner cannot take advantage of it. The matter came before the court below on petition and answer. The petition set forth those facts requisite under the Act of 1905, supra, to give the court jurisdiction. By way of answer, the oral agreements were set up, but the petitioner argued that these were in derogation of the Statute of Frauds; and the judge in his opinion supporting the decree stated that he considered this one question alone, and he based his decision on the Statute. We therefore cannot hold that the petitioner, either by act or omission, waived its right to plead the Statute of Frauds as a defense. On the contrary, it clearly indicated that this Statute was its reliance. See *Dutton v. Andersen,* 319 Pa. 483, 181 A. 511.

We will now examine the modifications of the covenants to pay rent as pleaded by the tenant in his answer. The first is alleged to be in writing "on or about February 1, 1933" modifying the rental for the ensuing year only. This written agreement was between the lessor and the lessee. The second and third modifications of the amount of rent to be paid by this lessee were orally agreed to in 1934 and 1935 for the respective ensuing years and were likewise solely between the lessor and the lessee. "Subsequently when the Banking Department of the Commonwealth of Pennsylvania took possession . . ." the modification was orally extended for the "balance of the term." But all of these modifications have been fully executed and therefore they can present no issue now. This position is sustained by both reason and authority. See *Davis v. Hillman,* 288 Pa. 16, 135 A. 254, and *Davis v. Investment Land Co.,* 296 Pa. 449, 146 A. 119. It is the variation of the rental for the full term of five years from February 1, 1937 (which is

wholly executory since no rent has been accepted under this new term), from that set forth in writing in the option to renew the written lease, that the petitioner urges makes the exercise of the option unenforceable by reason of the Statute of Frauds. The tenant's answer is that he exercised the written option contained in the lease as orally "modified at the reduced monthly rental referred to . . . , which . . . was accepted and agreed to . . . ," and that therefore the agreement upon which he relies is not an oral agreement, but a written agreement the rental terms of which were orally modified, and that this takes his case out of the Statute of Frauds. *Did* the oral modification of this written option reduce the writing to the legal status of a parol contract? In *Safe Deposit & Trust Co. v. Diamond Coal & Coke Co.*, 234 Pa. 100, 83 A. 54, this court, in an opinion by Justice MESTREZAT, said: "It is the doctrine of this court, declared in numerous cases, that where a written agreement is varied by oral testimony the whole contract in legal contemplation becomes parol. If there is anything settled in our law that principle is firmly established. When therefore a party to an executory agreement in writing for the sale of lands succeeds in reforming it by oral testimony he reduces the whole agreement to a parol contract, and deprives himself of the right to have it specifically performed. He pulls down the house on his own head. When he converts the writing into an oral agreement, the statute declares it to 'be void.' He has rectified the written contract and in its place has established an agreement which in contemplation of law is parol and therefore, by statutory mandate, absolutely invalid[3] and without force. . . . The statute is not a

---

[3] The rule of "absolute invalidity" thus stated by Justice MES-TREZAT is subject to some qualification. When one party sets up a contract prima facie nonenforceable because nonconformable to the Statute of Frauds, if the party to be charged thereon admits

mere rule of evidence, but a limitation of judicial authority to afford a remedy."

The rule that when a contract is required by the Statute of Frauds to be in writing its terms cannot be orally modified is well settled. The modification of a contract is subject to the same test to determine validity as is the original contract. See Williston on Contracts (1936), Vol. 2, p. 1709, sec. 594; *Swain v. Seamans,* 9 Wall. 254, 272; *Emerson v. Slater,* 22 How. 28, 42; *Marshall v. Lynn,* 6 Meeson & Welsby 109, and *Imperator Realty Co. v. Tull,* 228 N. Y. 447, 127 N. E. 263.

But the tenant's difficulty is more than the mere oral modification of this written option. His insuperable barrier is the fact that the written lease here was subsequent to the mortgage and that therefore "no privity of estate or contract is created between" the mortgagee "and the lessee." Since there was no privity of contract between the appellant and the appellee, the former is without standing to seek enforcement of the agreement invoked. Even if it should be conceded that appellee became a party by an oral agreement to an oral extension of a written option in a written lease between others, that option was one making the term of the lease exceed the term of three years. Such a lease to be effective against one who refused to be bound by it is required to be put in writing and "signed by the parties so making or creating the same or their agents thereunto lawfully authorized by writing." This record presents no such writing signed by either the mortgagee in pos-

---

the contract in his pleading, the mischief the Statute of Frauds was enacted to guard against becomes in that case nonexistent, and courts will then give the contract legal effect, if the statute is not interposed. In fact, the agreement originally in parole is then evidenced by the writings of the parties, and thereby the prescriptions of the statute are complied with. See *Sferra v. Urling,* 328 Pa. 161 (note on page 168); Story's Equity, Vol. 2, sec. 1041; *Christy et al. v. Brien et al.,* 14 Pa. 248; *Houser v. Lamont,* 55 Pa. 311, 317.

session or by its agent or its successor or by the purchaser at this judicial sale. The Statute is well invoked and the agreement pleaded is therefore unenforceable.

The judgment is affirmed.